**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| TIM DUNCAN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL NO.  SA-15-CV-148-XR |
| | § | |
| CHARLES BANKS, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

**ORDER**

On this date, the Court considered Defendant Charles Banks's Motion to Compel Arbitration, and in the Alternative, Transfer Venue (Docket no. 14) and reviewed each party's subsequent responses (Docket nos. 19, 21, 22, 31, 35, 36, 37, 45, 46, 47, and 48).  After careful consideration, the Court will GRANT IN PART and DENY IN PART Defendant's Motion to Compel Arbitration and GRANT Defendant's Alternative Motion to Transfer Venue.

**FACTUAL BACKGROUND**

**I.      The parties' relationship**

This lawsuit arises from the alleged violation of a fiduciary duty purportedly owed by Charles Banks ("Banks") to Tim Duncan ("Duncan") over a number of years.  (Docket no. 3, 1). Duncan is a professional basketball player.  (Docket no. 1, Ex. B.2, 2).  Around 1997, Duncan became acquainted with Banks, who was then the President of CSI Capital Management (CSI), a wealth management firm.  (Docket no. 1, Ex. B.2, 2; docket no. 14, 2).  Duncan allegedly developed a relationship with Banks and engaged CSI to manage Duncan's finances and investments.  (Docket no. 19, 4).  According to Duncan, Banks specifically was to act as Duncan's financial and investment advisor.  (*Id.*)

1

Duncan signed two agreements with CSI in 1997.  (*Id*.)  The first was an agreement for CSI to provide Duncan with investment counseling services, which both Duncan and Banks (on behalf of CSI) signed.  (Docket no. 19-1, 2, 3).  The second was an agreement for CSI to provide Duncan with "tax planning, tax compliance, and financial advisory services."  (Docket no. 19-2, 2).  This agreement was later replaced on April 1, 2000, with a new agreement contemplating the additional management of Duncan's day-to-day financial affairs by CSI.  (*See* docket no. 19-3, 2).  Both Duncan and Banks (again on behalf of CSI) were also signatories to this agreement.  (*Id*. at 4).

Prior to 2007, while Banks was still an executive at CSI, Banks counseled Duncan to enter into several investments.  (Docket no. 35-1, 6).  Duncan alleges Banks had a personal interest in many of these investments, either as an individual or through his position at CSI.  (*Id*.)  Among these investments were an investment in CSI Capital Management Properties, in which Banks was a registered investment advisor (docket no. 19, 8); an investment in Athlon Venture Fund, of whose General Partner Banks was a member (*id*.); an investment in Mad House Entertainment, of whose General Partner Banks was a member (*id*. at 9); and an investment in Dawson Real Estate Fund, a CSI affiliate (*id*.).  These investments also include a $4,000,000 investment in the Terroir Hotel and Resort Fund ("Hotel Fund I"), whose General Partner was indirectly owned by Banks' company Terroir Capital LLC ("Terroir").  (Docket no. 35-1, 6).

Banks left his position as President of CSI in 2007.  (*Id*. at 7).  Duncan and Banks disagree on what the nature of their relationship was during the few years following 2007.  Duncan claims that his relationship with Banks as a financial advisor continued after this time.  (*Id*.)  Banks claims, due to Duncan's contract with CSI, that CSI—not Banks—was Duncan's financial advisor both before and during this period.  (Docket no. 31, 9; docket no. 14, 4).  At

some point between 2007 and 2011, Banks advised Duncan to invest in Le Metier Beauty Investment Partners, LLC ("Le Metier").  (Docket no. 19, 9).

In 2007, Banks also became the founder of and majority interest holder in Terroir. (Docket no. 14, 2).  Terroir (and, by extension, Banks) indirectly owns the General Partner of Terroir Hotel and Resort Fund II, L.P. ("Hotel Fund II") and Terroir Winery Fund, L.P. ("Winery Fund"), two Delaware limited partnerships that invest, respectively, in the hotel and wine industries.  (*Id*. at 2-3).  Banks is also a member of the General Partner.  (Docket no. 32-1, 2).  Duncan, on Banks's recommendation, invested in both the Hotel Fund II and the Winery Fund.  (Docket no. 1, Ex. B.2, 6; docket no. 14, 3).  Duncan purchased 75 units of limited partner interest in Hotel Fund II on July 21, 2007, for a total price of $7,500,000.  (Docket no. 15-3, 11; docket no. 37, 3).  Duncan became a limited partner in the Winery Fund on November 9, 2010, making an initial investment of $1,000,000.  (Docket no. 15-1, 17; docket no. 37, 3).

In 2011, CSI was purchased by SunTrust Bank.  (Docket no. 19, 4).  With that purchase, Duncan's contractual relationship with CSI ended.  (*Id*.)  Duncan contends that Banks continued as his financial advisor with a fiduciary duty to Duncan after 2011 due to Duncan's reliance on Banks and their "personal relationship of trust and confidence."  (*Id*. at 10).  Again, Banks denies that he was ever Duncan's official financial advisor or bore any fiduciary relationship to Duncan. (Docket no. 14, 4).

The following year, Banks encouraged Duncan to make a loan to Gameday Entertainment, LLC ("Gameday").  (Docket no. 1, Ex. B.2, 3).  Banks was at the time, and is currently, the Chairman of Gameday.  (Docket no. 19, 9).  Duncan made the loan by purchasing a Note and Warrant Purchase Agreement ("Gameday Note") with a face value of $7,500,000. (*Id*.)  Duncan alleges he was informed: (1) that his note was a superior note not to be

subordinated to any other Gameday debts, (2) that it was not to guarantee any of Gameday's other debts, and (3) that payments on the note were not to be reduced by advisory fees or any other fees. (Docket no. 1, Ex. B.2, 3). None of these, Duncan alleges, turned out to be true.

Duncan first alleges that his note was: (1) subordinated to and (2) used to secure other Gameday debts. (Docket no. 19, 21; docket no. 1, Ex. B.2, 5). According to Duncan, "a UCC-1 would be filed to secure [Duncan's] note and its priority." (Docket no. 19, 21). However, Duncan later learned that Comerica Bank claims it possesses both a guaranty that guarantees a $6,000,000 loan made by Comerica to Gameday and a subordination agreement that subordinates Duncan's loan to Gameday to the Comerica loan. (Docket no. 1, Ex. B.2, 5). Both documents are purportedly signed by Duncan, but he claims that he signed neither the guaranty nor the subordination agreement, that he authorized no one to do so on his behalf, and that the signatures on both documents are forgeries. (*Id.*) Duncan further alleges that Gameday's payments on the note to him were reduced in order to pay a fee to Banks. (Docket no. 1, Ex. B.2, 3-4). According to Duncan, "Banks instructed Gameday to withhold twenty percent (20%) of the amounts due Duncan under the Gameday Note as Banks' 'fee.'" (Doc 1, Ex. B.2, 3-4). The record is unclear as to the fate of the withheld funds. Duncan claims that this withheld money has not been returned to him. (*Id.* at 9). Banks alleges that the withheld funds were returned to Duncan in full prior to Duncan's filing of the initial complaint. (Docket no. 14, 9).

Duncan makes several allegations that Banks personally benefitted from the money that Duncan loaned to Gameday. He first alleges that more than $4,100,000 of the money was loaned either directly to Banks individually or to Banks-controlled/affiliated entities. (Docket no. 19, 21). Duncan also contends that "Hammer Holdings, which Banks co-owns, and Banks personally received 35% and 12.5% stakes, respectively, in Gameday for securing the Duncan

financing for Gameday.  None of these facts were disclosed to Duncan."  (*Id*.)  Duncan further alleges that "Banks or a Banks affiliated entity [Hammer Holdings] received more than $1.25 million in fees for securing the Guaranty and Subordination agreement. . . . According to Gameday's representative, half of that money was to go to Duncan.  Duncan never received the money."  (*Id*. at 22).

In 2014, Duncan needed to account for his assets as part of a family law proceeding and asked Banks, Gameday, and the Funds to cooperate fully with his lawyers and other financial professionals.  (Docket no. 1, Ex. B.2., 6).  According to Duncan, "each of these entities (all of which Banks controls or strongly influences) refused to make full disclosure of financial statements or other documents . . . ."  (*Id*.)  On January 29, 2015, Duncan filed this lawsuit alleging breach of fiduciary duty.  (*Id*. at 7-9).  On April 16, 2015, Banks filed a motion to compel arbitration of all of Duncan's claims against Banks according to arbitration provisions located within a few of the agreements.  (Docket no. 14, 1).  In the alternative, Banks moves to transfer venue of all claims relating to the Gameday Note to the United States District Court for the District of Colorado, Denver Division, pursuant to a mandatory forum selection clause of the Gameday Note.  (Docket no. 14, 11-12).

## II.    The arbitration clauses

There are many investments and agreements germane to the factual allegations made by Duncan to support his claim for breach of fiduciary duty.  Early on, Banks seemed to imply that many of the investments were made "pursuant to agreements containing arbitration clauses."[1] (*See* docket no. 37, 3, n. 3).  However, at a June 10, 2015, hearing, Banks stipulated that the only investments at issue whose relevant agreements contain arbitration clauses are Hotel Fund I,

---

[1] Banks contended that his list of contracts that contained arbitration agreements "does not purport to be an exhaustive list of all investments Duncan identified in [Docket no. 19, 8-9] that were made pursuant to agreements containing arbitration clauses."

Hotel Fund II, and the Winery Fund. (Docket no. 41, 19).   Further discovery failed to turn up any other agreements to arbitrate in the numerous other investments at issue in this case, including the Gameday Note. (*See* docket no. 15-5).

A.  Hotel Fund I

This investment was governed by three documents: 1) the Tairwoir Resort and Hotel Fund, L.P. Subscription Agreement ("Hotel Fund I SA"); 2) the Terroir Resort and Hotel Fund, L.P. Supplement to Subscription Agreement ("Hotel Fund I SSA"); and 3) the Terroir Resort and Hotel Fund, L.P. Confidential Private Placement Memorandum ("Hotel Fund I PPM").   (*See* docket no. 38) (listing the agreements covering Duncan's investment in Hotel Fund I).

The Hotel Fund I SA contains the following arbitration clause:

> **The parties waive their rights to seek remedies in court, including any right to a jury trial.** The parties agree that any dispute between or among any of the parties or any of their Affiliates arising out of, relating to or in connection with this Subscription Agreement or the Fund or its formation, organization, capitalization, business or management, shall be resolved exclusively through binding arbitration conducted under the auspices of JAMS. . .

(Docket no. 38-1, § 9) (emphasis in original).  The Hotel Fund I SA is signed by Duncan and by Leland Faust in his capacity as manager of Tairwoir Hotel and Resort Management, LLC (on behalf of Tairwoir Hotel and Resort Fund, LP).   (Docket no. 38-1, 11-15).  Banks is not a signatory.  (*Id.*)

The word "Affiliates" is left undefined in the agreement, but it provides that "[c]apitalized terms used and not otherwise defined in this Subscription Agreement have the meanings respectively ascribed to them in the Memorandum," which is defined in turn as the Hotel Fund I PPM.  (*See* docket no. 38-1).  The Hotel Fund I PPM continues the chain and states many of the terms are defined in the Hotel Fund I SSA.  (Docket no. 43-1, BANKS-

6

WDTX00000419 – 565, at 477).  This document defines "Affiliate" as "any person directly or indirectly controlling, controlled by or under common control with the specified person." (*Id.* at 505).

B.  Hotel Fund II

Duncan's interest in the fund is governed by three documents: (1) the Hotel Fund II Subscription Agreement ("Hotel Fund II SA"), (2) the Hotel Fund II Limited Partnership Agreement ("Hotel Fund II LPA"), and (3) the July 19, 2007 Memorandum ("Hotel Fund II PPM").  (Docket no. 14, 3).  The Hotel Fund II SA contains an arbitration clause identical to the arbitration clause in the Hotel Fund I SA.  (Docket no. 15-3, § 11).  The Hotel Fund II SA is signed by Duncan and by Terroir Hotel and Resort Fund II, LP (by Aaron Faust in his capacity as a managing member).  (Docket no. 15-3, 11).  Banks is not a signatory.  (*Id.*)

The Hotel Fund II LPA provides:

> The Partners agree that any dispute between or among any of the Partners or any of their Affiliates ... shall be resolved exclusively through binding arbitration . . .

(Docket no. 45, 10.)

The Hotel Fund II SA does not define "Affiliate" but provides that "[c]apitalized terms used and not otherwise defined in this Subscription Agreement have the meanings respectively ascribed to them in the Memorandum."  (Docket no. 14, 3).  The Hotel Fund II PPM contains a glossary that defines "Affiliate" as, among other things, "any person directly or indirectly controlling, controlled by or under common control with the specified person."  (Docket no. 43, 1, BANKS-WDTX00000139 – 275, at 209).  The parties' supplemental briefing indicates that the Hotel Fund II LPA contains the same definition.  (Docket no. 45, 10–11).

C.  The Winery Fund

Duncan's interest in this fund is governed by three documents: (1) the Winery Fund Subscription Agreement ("Winery Fund SA"), (2) the Winery Fund Limited Partnership Agreement ("Winery Fund LPA"), and (3) an October 12, 2010 Memorandum ("Winery Fund PPM"). (Docket no. 14-3; docket no. 46, 14). The Winery Fund SA is signed by Duncan and by Terroir Partners GP LP (by Banks as manager of Terroir Partners II LLC, General Partner) (Docket no. 15-1, 15-17). The Winery Fund LPA is signed by Terroir Partners GP LP (by Banks as manager of the General Partner of Terroir Partners II LLC), Terroir Partners II Fund Management (by Banks as manager), and by Banks as Initial Limited Partner. (Docket no. 15-2, 78-82).

The Winery Fund SA arbitration clause provides in part:

> Any claim, dispute, or controversy brought by the Subscriber against the General Partner, the Administrative General Partner, the Management Company (or their respective direct or indirect owners, officers, directors, managers, affiliates or employees in their capacity as such, or in any related capacity) or the Partnership, or relating in any way to this Subscription Agreement, the Partnership Agreement or other Offering Materials, including without limitation, any action or claim based on tort, contract, or statute, or concerning the interpretation, effect, termination validity, performance, and/or breach of this Subscription Agreement, shall be resolved by final and binding arbitration ("Arbitration") before a single arbitrator ("Arbitrator") selected from and administered by the JAMS Alternative Dispute Resolution or its successor in accordance with its then existing arbitration rules or procedures regarding commercial or business disputes. . . .

(Docket no. 15-1, § 4(f)).

### III.  The Gameday forum-selection clause

The Gameday Note and Warrant Purchase Agreement contains a mandatory venue clause that states, in part:

> Each of the parties hereto hereby consents to the exclusive jurisdiction of the
> state and federal courts residing in Denver, Colorado . . . for the purpose of
> any suit, action or other proceeding arising out of or in connection with this
> agreement, the note, the warrant, the security agreement or any of the
> transactions contemplated hereby.  Each party hereby expressly waives any
> and all rights to bring any suit, action or other proceeding in or before any
> court or tribunal other than the courts described above and covenants that it
> shall not seek in any manner to resolve any dispute other than as set forth in
> this section 5.3 . . . .

(Docket no. 15-5, § 5.3) (original written in all capital letters).  Duncan is a signatory to that

agreement.  *Id*. at 8.  The other signatory to the agreement is Jeffery Neal, the CEO of Gameday,

not Banks.  *Id*.  However, as Duncan alleges, Banks was "acting as Chairman of Gameday" when

the actions relevant to the allegations in question took place.  (Docket no. 1, Ex. B.2, 3).

## DISCUSSION

### I.      Choice of Law

As a preliminary matter, the Court must decide what law will apply to the dispute

between Duncan and Banks over arbitrability—federal, Texas, or Delaware.  *See Crawford*

*Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257 (5th Cir. 2014).  The Federal

Arbitration Act ("FAA") applies in this case because the agreements containing arbitration

clauses are each "contract[s] evidencing a transaction involving commerce." 9 U.S.C. § 2;

*Glazer's, Inc. v. Mark Anthony Brands Inc.*, No. SA-11-CV-977-XR, 2012 WL 2376899, at *5

(W.D. Tex. June 22, 2012) (Rodriguez, J.).  However, nothing in the FAA changes the

background principles of state contract law regarding the scope of agreements and who is bound

by them.  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 624 (2009).  Thus, state law is

applicable in determining whether arbitration must be compelled.  *Crawford*, 748 F.3d at 255,

257 (explaining that the Fifth Circuit's "prior decisions applying federal common law, rather

than state contract law, to decide such questions . . . have been modified to conform with *Arthur Andersen*.").

A federal court sitting in diversity follows the choice of law rules of the state in which the court sits. *Crawford*, 748 F.3d at 258. This Court, then, follows the choice of law rules of the State of Texas. Banks insists that Delaware law applies on the basis of choice of law clauses contained in the Fund Agreements. (Docket no. 14, 8, fn. 6). Duncan disputes that Delaware law applies, implying that Texas law ought to apply. (Docket no. 19, 15, fn. 76). However, Duncan does not address the choice of law provisions, nor does he provide any additional reasons as to why any law other than Delaware's ought to apply. (*See generally* docket no. 19).

"Under Texas choice of law principles, contractual choice of law provisions are generally upheld." *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 228 (5th Cir. 2008). To determine the validity of contractual choice of law clauses, Texas courts use the standard set forth in the Second Restatement of Conflict of Laws ("Restatement"). *In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 549 (Tex. 2002). In relevant part, the Restatement provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either:
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971).

The first exception (§ 187(2)(a)) is a weak and relaxed one.  *Crawford*, 748 F.3d at 258.

While a choice of law clause made "in the spirit of adventure or to provide mental exercise for

the judge" will be rejected, the choice of law will be upheld if "the state of the chosen law has

some substantial relationship to the parties or the contract."  RESTATEMENT (SECOND) OF

CONFLICT OF LAWS § 187 cmt. f. (1971).  The substantial relationship may be created in

many ways, including when "one of the parties is domiciled or has his principal place of

business" in the chosen state.  *Id*.  The scope of the second exception (§ 187(2)(b)) is, according

to the Restatement itself, difficult to define.  *Id*. at cmt. g.  Any fundamental policy that would be

violated by applying the law of the chosen state must be substantial.  *Id*.  A state will apply its

own legal principles in determining whether the violated policy is fundamental or substantial.  *Id*.

A fundamental policy is not violated simply because the outcome of the lawsuit in the two states

would be different.  *Id*.  When the outcome of the lawsuit would be the same under the laws of

either state, however, a fundamental policy is not violated.  *Crawford*, 748 F.3d at 259.

Federal courts applying the Restatement standards have used choice of law clauses to

determine the law under which to evaluate a motion to compel arbitration.  *Crawford*, 748 F.3d

at 259.  In *Crawford*, the defendants sought to compel arbitration of the claims against them.  *Id*.

The defendants argued that Arizona law should apply because the contract containing the

arbitration agreement also contained a choice of law clause requiring the use of Arizona law.  *Id*.

at 257.  The plaintiffs contended, without addressing the choice of law clauses or otherwise

explaining why, that Mississippi law should apply.  *Id*. at 257-58.  The Fifth Circuit Court of

Appeals held that there was a substantial relationship between the parties or contract and the

forum because the defendants' business operations were located in Arizona.  *Id*. at 258.  It also

held that no fundamental policy of Mississippi was violated by using Arizona law because the lawsuit's outcome would be the same under either state's law. *Id.* at 259.

Here, the various Fund Agreements contain choice of law provisions.  (Docket no. 15-1, § 4(e); docket no. 15-2, § 13.3; docket no. 15-3, § 10; docket no. 15-4, § 24; docket no. 38-1, § 11).  First, the Hotel Fund I SA choice of law clause provides that "[t]his Subscription Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware."  (Docket no. 38-1, § 11).  Second, the Hotel Fund II SA choice of law clause provides that "[t]his Subscription Agreement shall be governed by and construed and interpreted in accordance with the law of the State of Delaware."  (Docket no. 15-3, § 10). Finally, the Winery Fund SA choice of law clause provides that "[t]his Subscription Agreement will be governed by and construed in accordance with the laws of the jurisdiction of formation of the Partnership to which the subscriber is admitted as a limited partner . . . ." (Docket no. 15-1, § 4(e)).  Terroir Winery Fund, L.P., was formed in Delaware.  (Docket no. 14, 2).  Thus, this choice of law clause refers to Delaware law as well.

The choice of law clauses in the Fund Agreements all call for the use of Delaware law. Additionally, neither of the exceptions from the standard set forth in the Restatement is likely to apply.  First, there is a substantial relationship between Banks, Duncan, the Fund Agreements, and Delaware.  The Fund Agreements are all authored by businesses incorporated in Delaware. Duncan signed those agreements.  Banks is a member of the General Partner of those Delaware entities.  Banks signed the Winery Fund agreements in that capacity.  It is plain that the choice of Delaware law is not based on an adventurous spirit or the desire to provide the Court with mental exercise.  The choice is based on the fact that the Funds with which Duncan was making the

deals are Delaware entities.  These circumstances establish a substantial relationship between Banks, Duncan, the Fund Agreements, and Delaware.

Second, Texas is not a state with a materially greater interest in the outcome of this case than Delaware, nor does Texas have a fundamental policy that would be violated by the application of Delaware law.  Duncan is a citizen of Texas.  Banks is a citizen of Georgia.  The Funds are incorporated in Delaware, but their principal place of business is California.  It is unknown exactly where the Fund Agreements were signed and executed.  Given this spread of contacts, it cannot definitively be said that Texas has a materially greater interest in the outcome of this case than Delaware.

Texas has no fundamental policy that the application of Delaware law would violate. Duncan has not identified any such policy.  Therefore, the Court finds that Duncan "failed to demonstrate that applying [Delaware] law in this instance would be contrary to a fundamental policy of [Texas]."  *See Crawford*, 748 F.3d at 259.  Further, Delaware courts have found, in cases related to whether breach of fiduciary duty claims must be arbitrated, that Texas and Delaware laws are substantially the same.  *Douzinas v. American Bureau of Shipping, Inc.*, 888 A.2d 1146, 1148-49 (Del. Ch. 2006).  Because this case would be resolved the same way in either Texas or Delaware, the application of Delaware law does not contravene any fundamental policy of Texas.  For these reasons, the Court will apply Delaware law in analyzing the arbitration clauses and determining whether Banks, as a non-signatory, can enforce the arbitration clauses against Duncan.

## II.     Breach of Fiduciary Duty

At this time, the Court considers no arguments concerning the existence of a fiduciary duty owed to Duncan by Banks.  This is because breach of fiduciary duty claims are arbitrable claims.

*E.g. Douzinas*, 888 A.2d at 1150; *Arthur*, 556 U.S. at 624.  Any argument for or against Banks's motion to compel arbitration based on either the existence or non-existence of a fiduciary duty begs the ultimate question in this case.  Therefore, keeping with the federal policy in favor of arbitration, the Court does not consider the issue of fiduciary duty at this time.

### III.     Motion to Compel Arbitration

Banks moves to compel arbitration on two grounds: (1) pursuant to the terms of the Funds Agreements (particularly the arbitration clause contained in the Winery Fund SA) and the Federal Arbitration Act ("FAA") and (2) under the doctrine of equitable estoppel.  (Docket no. 14, 7-8).

Both Delaware and federal policy strongly favor arbitration.  *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 526 (5th Cir. 2000); *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286 (Del. 1999).  In considering a motion to compel arbitration under the FAA, courts engage in a two-step analysis.  *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008).  The first step is to determine whether the parties have agreed to arbitrate the dispute.  *Id*.  If the parties are found to have agreed to arbitrate the dispute, the court continues to step two of the analysis.  *Id*.  The second step is to determine whether any federal statute or policy renders the claims nonarbitrable.  *Id*.  In the absence of a contrary federal statute, arbitration should be compelled in accordance with the FAA.  9 U.S.C. § 3.

### A.  Have the parties agreed to arbitrate the dispute?

First, a court must determine if the parties have agreed to arbitrate the dispute.  *Sherer*, 548 F.3d at 381.  This involves two factors: 1) is there a valid agreement between the parties to arbitrate and 2) does the dispute in question fall within the scope of that arbitration agreement? *Id*.

    1.  *Is there a valid agreement between Duncan and Banks to arbitrate?*

This Court finds that there is a valid agreement between Duncan and Banks to arbitrate disputes related to Hotel Fund I, Hotel Fund II, and the Winery Fund.  It finds no evidence that Duncan and Banks agreed to arbitrate claims related to any of the other investments.

 First, the arbitration clauses in the agreements governing Hotel Fund I, Hotel Fund II, and the Winery Fund constitute valid agreements to arbitrate that Banks is entitled to enforce. Duncan argues that these clauses do not constitute valid agreements to arbitrate because Banks is not a signatory to them in his individual capacity.  (Docket no. 19, 14; docket no. 45, 2–12).  As a non-signatory, Duncan argues, Banks cannot enforce the arbitration clauses against Duncan. The Court finds, however, that Banks' status as a non-signatory to the Fund Agreements does not preclude him from enforcing them against Duncan in this case because he can be classified as either an affiliate or an indirect owner, depending on which particular agreement is at issue. Suits against Banks are specifically contemplated by the terms of the arbitration clauses themselves.  Second, under the doctrine of equitable estoppel, Banks may, as a non-signatory, enforce the arbitration agreements against Duncan, a signatory.

    a.  The Terms of the Agreements

First, the terms of the agreements that contain arbitration clauses encompass Banks and claims against him.  Decisions regarding the original existence of a valid arbitration agreement are "generally made on the basis of ordinary state-law principles that govern the formation of contracts."  *Morrison v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008).  In this case, those state-law principles will come from Delaware law.  Neither Duncan nor Banks has provided any Delaware law directly on this point.  However, given that Delaware courts have said that Texas's

law of arbitration is substantially similar to Delaware's law, the use of Texas law to illustrate this point is appropriate. *Douzinas*, 888 A.2d at 1148-49.

When an arbitration clause expressly contemplates a non-signatory defendant, a valid arbitration agreement exists between the non-signatory and a signatory. *Satre v. Dommert*, 184 S.W.3d 893, 897–98 (Tex. App.—Beaumont 2006, no pet.) (holding that a signatory plaintiff and non-signatory defendant "entered into an arbitration agreement under the FAA" where "the arbitration clause expressly extend[ed] to [signatory's] agents" and the defendant was an agent of a signatory). The arbitration clauses present in the agreements governing Hotel Fund I, Hotel Fund II, and the Winery Fund each contemplate non-signatory defendants and impliedly include Banks in their terms, because he can be classified as either an affiliate or an indirect owner.

Duncan disputes that Banks should be considered an indirect owner or an affiliate under the terms of the agreements. (Docket no. 45, 2). He contends that the various agreements relevant to Hotel Fund I, Hotel Fund II, and the Winery Fund create conflicting standards as to whether Banks is included as a potential defendant per the arbitration clauses, and as such, should not be permitted to invoke them. *Id.* Additionally, he argues that the Wine Fund LPA contains a much narrower arbitration clause than the Wine Fund SA that would necessarily exclude Banks. *Id.* at 5. The Court finds otherwise.

First, the subscription agreements for both Hotel Fund I and Hotel Fund II include "Affiliate" in the list of persons covered by the arbitration agreement. (Docket no. 46, 9–11). The Hotel Fund II LPA includes it as well. (Docket no. 45, 10). "Affiliate" is defined in the PPM for Hotel Fund I as "any person directly or indirectly controlling, controlled by or under common control with the specified person." (Docket no. 46, 9). The PPM for Hotel Fund II and the Hotel Fund II LPA contains the same definition. *Id.* at 12; (docket no. 45, 10). Duncan

contends that the definition included in the PPM for Hotel Fund I should not be considered because Banks has only produced an unsigned copy of the document. (Docket no. 45, 3). Duncan's supplemental briefing did not include an argument about whether or not the Hotel Fund II PPM should be considered or disregarded.

Second, the terms of the Winery Fund SA provide for mandatory arbitration of "[a]ny claim, dispute, or controversy brought by the Subscriber [Duncan] against the General Partner . . . the Management Company (or their respective direct or indirect owners, officers, directors, managers, affiliates . . .)." (Docket no. 15-1, § 4(f)). Neither indirect owner nor affiliate is defined in the agreement. (Docket no. 45, 3). However, Delaware has a statutory definition of the term "affiliate" as "a person that directly, or indirectly through 1 or more intermediaries, controls, or is controlled by, or is under common control with, the person specified." Del. Code tit. 8, § 203(c)(1).

The Court finds that each of the definitions presented would encompass Banks. Banks owns 90% of Terroir Capital, which is the indirect owner of the general partner of Hotel Fund I, Hotel Fund II, and the Winery Fund. (Docket no. 46, 8). As the majority owner of the general partner of the funds, the Court concludes that Banks has the ability to exercise control over the Funds, and is therefore an Affiliate or indirect owner. As a result, the Court concludes that Banks is an Affiliate under the arbitration clauses for Hotel Fund I and Hotel Fund II and an indirect owner for the purposes of the Winery Fund and as such was expressly contemplated by the arbitration clauses. Duncan signed these agreements and so is bound by the agreements' terms. Therefore, like the parties in *Satre*, Banks and Duncan entered into valid arbitration agreements with respect to Hotel Fund I, Hotel Fund II, and the Winery Fund, which Banks may seek to enforce.

    b.  Equitable Estoppel

Both parties agree that once the Court has determined that claims against Banks are expressly covered by the arbitration agreements, Banks does not need to invoke the doctrine of equitable estoppel in order to enforce the agreements.  (Docket no. 45, 12; docket no. 46, 15). The Fifth Circuit has ruled that if an arbitration agreement expressly includes arbitration with non-parties to the contract, the signatory is bound by it and must arbitrate with the non-party. *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 382–83 (5th Cir. 2008) ("We need not and do not address the district court's holding on the availability of equitable estoppel.").  However, for the sake of due diligence, the Court will examine the doctrine of equitable estoppel.

Banks, as a non-signatory, may compel Duncan to arbitrate under the terms of Hotel Fund I, Hotel Fund II, and the Winery Fund under the doctrine of equitable estoppel.  Both Delaware law and the federal substantive law of arbitration allow non-signatories to an arbitration agreement to compel signatories to arbitrate under certain circumstances, including equitable estoppel.  *See Arthur*, 556 U.S. at 624; *Crawford*, 748 F.3d at 255; *Douzinas*, 888 A.2d at 1153.

Delaware law and federal law are identical on this point.  The Delaware law of equitable estoppel as applied to arbitration is lifted directly from *Grigson v. Creative Arts Agency*, a Fifth Circuit case.  *Grigson*, 210 F.3d at 527.  Under both Delaware law and federal law, the doctrine of equitable estoppel is applied as follows:

> *First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.*  When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. *Second, application of equitable estoppel is warranted when the*

> *signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.*

*Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, 2006 WL 2473665, at *4–5 (Del. Ch. 2006) (quoting *Grigson*, 210 F.3d at 527) (emphasis in original).

There are two situations in which the doctrine of equitable estoppel will compel a signatory to arbitrate with a non-signatory. *Wilcox*, 2006 WL 2473665 at *4. The first is "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement" to make his claims. *Id*. at *5. The second is "when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Id*. The second basis for applying equitable estoppel is not contested here. There are no allegations of "interdependent and concerted misconduct" between Banks (the non-signatory) and any other signatory to the Fund Agreements.

Duncan must rely, at least in part, on the written terms of the Fund Agreements to prove his claims for two reasons. First, Duncan relies on the Fund Agreements to make his claims because Duncan's claims presume the existence of the Fund Agreements. A signatory's "claims arise out of and relate directly to the written agreement" when the "claims against a nonsignatory [make] reference to *or [presume] the existence of* the written agreement." *Wilcox*, 2006 WL 2473665 at *5 (emphasis added). Duncan asserts that "[t]he true nature of Duncan's claims [is] that he would not have invested his family's financial future in these wineries and funds if Banks had advised him that they would be operated for Banks' benefit and to the detriment of Duncan and the other investors." (Docket no. 19, 16). This statement indicates that Duncan's claims

would not exist but for the Fund Agreements.  Had the agreements not been made, there would have been no breach of Banks' alleged fiduciary duties.  Therefore, Duncan's claims "presume the existence of the written agreement" and the doctrine of equitable estoppel is applicable.

Second, Duncan's claims rely on the Fund Agreements because Duncan will inevitably need to refer to their contents to prove the elements of his case.  Damages are a necessary element of Duncan's claims.  Therefore, the performance of the Funds is an integral part of the claims.  Duncan seems to acknowledge as much when he expresses that part of "the true nature of [his] claims" is the Funds' being "operated for Banks' benefit and to the detriment of Duncan. . . ." *Id*.  Determining the validity of these claims will inevitably require ascertaining the benefits to which Banks was contractually entitled under the terms of the Fund Agreements and assessing the performance and management of the Funds.  Though Duncan may word his claims in such a way as to avoid directly mentioning the Fund Agreements, he cannot avoid making reference to them when proving his claims.  Therefore, Banks may invoke the doctrine of equitable estoppel to compel Duncan to arbitrate his claims.

Duncan claims that he does not rely on the Fund Agreements to make his claims. (Docket no. 19, 16).  Rather, Duncan argues that his claims "rise and fall on the duties [purportedly] owed to him by Banks that existed long before the Fund transactions."  (*Id*.). Duncan relies on the Fifth Circuit's holding in *Noble Drilling Servs. v. Certex* to support this argument.  *Noble*, 620 F.3d at 469.  In *Noble*, the defendant (signatory to an agreement containing an arbitration clause) attempted to compel the plaintiff (a non-signatory) to arbitrate its claims.  *Id*. at 472.  The plaintiff argued that its claims did not specifically make reference to any of the terms of the agreement.  *Id*.  Instead, it contended the claims were based on false representations made by the defendant prior to the plaintiff's purchase of defendant's products.

*Id*.  The Fifth Circuit agreed, reversing the decision of the trial court, and held that the plaintiff "was not required to base its claims on the [agreement] and can, as it has, disclaim any reliance thereupon.  [Plaintiff's] claims—by its own admission—rise or fall on the pre-purchase representations and whatever duties a manufacturer and distributor have by law."  *Id*. at 474–75.

Duncan argues that this case is like the *Noble* case.  Like the plaintiff in *Noble*, Duncan disclaims any reliance upon the Fund Agreements in making his claims.  Furthermore, Duncan argues that his claims rise or fall on Banks's pre-purchase representations (or lack thereof) about the Funds in which Duncan was investing.  Therefore, Duncan argues that this Court should find that Duncan's claims need not be arbitrated.

But Duncan's reliance on *Noble* is misplaced.  The Fifth Circuit's holding in *Noble* concerns the doctrine of direct-benefits estoppel, not equitable estoppel.  *Noble*, 620 F.3d at 472.  Direct-benefits estoppel is a separate legal doctrine from equitable estoppel with a different legal standard.  *Compare Noble*, 620 F.3d at 473 (setting forth the legal standard for direct-benefits estoppel); *with Grigson*, 210 F.3d at 527 (setting forth the legal standard for equitable estoppel).  According to *Noble*, "[d]irect-benefits estoppel involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract."  *Noble*, 620 F.3d at 473.  That does not describe this case.  Banks, the non-signatory, is not attempting to repudiate this arbitration clause—he is attempting to enforce it.  Additionally, one way in which a non-signatory can "embrace" a contract is by "seeking to enforce the terms of that contract . . . ."  *Id*.  Banks is seeking to enforce the arbitration clause, which is a term of the Fund Agreements.  Even if direct-benefits estoppel applied in this case, the doctrine would support the enforcement of the arbitration clauses against Duncan.

Duncan makes several more arguments for why Banks should not be permitted to invoke the doctrine of equitable estoppel to compel arbitration. These include arguments that Duncan, relying on Banks to treat him with utmost fairness in Banks' capacity as a fiduciary, likely did not receive or read the entire agreements; that Duncan's signatures were neither witnessed nor notarized on the Fund Agreements' signature pages; and that the Fund Agreements were not properly authenticated. These arguments fail because they attack the validity of the Fund Agreements as a whole, not just the arbitration clauses. Allegations of the invalidity of a contract as a whole "must be submitted to the arbitrator to decide" because "the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006). Duncan's allegations apply to the validity of the Fund Agreements in their entireties. He does not allege that he read the Agreements except for the arbitration clauses, that the arbitration clauses alone were somehow fraudulently added to the Fund Agreements, or that the Fund Agreements are authenticated except for the arbitration clauses. Instead, he attacks the validity of the agreements as a whole. For this reason, the standard set forth by the Supreme Court applies and Duncan's concerns regarding the validity of the Fund Agreements must be submitted to arbitration.

Finally, Duncan argues that Banks should be estopped from enforcing the arbitration clauses because Banks violated his fiduciary duties. (Docket no. 19, 18). This argument fails on the ground that it presumes the existence of a fiduciary duty. Again, the Court does not make a judgment concerning the existence of a fiduciary duty at this time and cannot entertain arguments against arbitration that presume the existence of a fiduciary duty.

For all of the above reasons, the Court finds that there is a valid agreement to arbitrate claims between Banks and Duncan and that Banks may compel Duncan to arbitration—but only

with respect to allegations related to Hotel Fund I, Hotel Fund II, and the Winery Fund. No documents evidencing agreements to arbitrate have been presented to the Court for any of the other investment funds or the Gameday Note. As such, the Court limits its holding here to apply only to any claims arising out of Hotel Fund I, Hotel Fund II, and the Winery Fund.

   *2.  Does this dispute fall within the scope of those arbitration agreements?*

   Even if the Court finds that the parties have a valid agreement to arbitrate, in order to successfully move for arbitration, the dispute must fall within the scope of that agreement. *Sherer*, 548 F.3d at 381. But because the parties have agreed to arbitrate arbitrability, the Court cannot determine which of Duncan's claims fall within the scope of the Hotel Fund I, Hotel Fund II, and Winery Fund arbitration agreements. Instead, this determination must be made by the arbitrator.

   Ordinarily, the determination of whether a specific claim is subject to arbitration is a question for a court. *Crawford*, 748 F.3d at 262; *Ishimaru v. Fung*, No. Civ.A. 929, 2005 WL 2899680, at *13 (Del. Ch. Oct. 26, 2005) (quoting *SBC Interactive, Inc. v. Corporate Media Partners*, 714 A.2d 758, 761 (Del. 1998)). "However, if the parties have clearly and unmistakably agreed to arbitrate arbitrability, certain threshold questions—such as whether a particular claim is subject to arbitration—are for the arbitrator, and not a court, to decide." *Crawford* 748 F.3d at 262 (citation omitted); *3850 & 3860 Colonial Blvd., LLC v. Griffin, No. 9575-VCN*, 2015 WL 894928, at *4 (Del. Ch. Feb. 26, 2015). "'Just as the arbitrability of the merits of a dispute depends on whether the parties agreed to arbitrate that dispute, so the question "who has the primary power to decide arbitrability" turns upon what the parties agreed about *that* matter.'" *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)) (emphasis in

original).  The Fifth Circuit mandates that an arbitrator, not the court, must decide arbitrability if two factors are met: (1) the parties "clearly and unmistakably" intended to delegate this power to the arbitrator, and (2) the assertion of arbitrability is not wholly groundless.  *Douglas v. Regions Bank*, 757 F.3d 460, 462 (5th Cir. 2014).

   a.   "Clearly and Unmistakably"

First, an arbitrator, and not a court, only has the power to decide the scope of an arbitration agreement if the parties "clearly and unmistakably" intended to delegate this power to the arbitrator.  *Id.*  An arbitration clause "need not recite verbatim that the parties agree to arbitrate arbitrability in order to manifest clear and unmistakable agreement." *Hous. Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 765 F.3d 396, 410 n. 28 (5th Cir. 2014). Instead, express incorporation of the rules of the arbitration service constitutes "clear and unmistakable evidence" that the parties have agreed to arbitrate arbitrability. *Crawford*, 748 F.3d at 262–63 (citing *Petrofac*, 687 F.3d at 675).

Delaware law is similar to the Fifth Circuit on this issue, but contains one extra requirement.  *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).  In Delaware, when "the arbitration clause generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability," there is "clear and unmistakable" evidence that the parties have agreed to arbitrate arbitrability.  *Id.*

The arbitration clauses in the Fund Agreements meet both the Delaware and Fifth Circuit standards for "clear and unmistakable" evidence that the parties have agreed to arbitrate arbitrability with respect to claims related to Hotel Fund I, Hotel Fund II, and the Winery Fund. First, the arbitration clauses in those three Fund Agreements all stipulate that the arbitration they mandate will be conducted by and in accordance with the rules of JAMS Alternative Dispute

Resolution ("JAMS").  (Docket no. 15-1, § 4(f); docket no. 15-2, § 13.8; docket no. 15-3, § 11; docket no. 15-4, § 30; docket no. 38-1, § 9).  JAMS Comprehensive Arbitration Rule 11 provides as follows:

> (a) Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.
> (b) Jurisdiction and arbitrability disputes, *including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought*, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter…

(Docket no. 34-2) (emphasis added).  The plain text of these rules authorizes the arbitrator to decide issues regarding the existence, validity, scope, and arbitrability of a dispute.  Therefore, the Fund Agreements incorporate a set of arbitration rules that empower arbitrators to decide arbitrability.  *Crawford*, 748 F.3d at 262–63 (citing *Petrofac*, 687 F.3d at 675); *James*, 906 A.2d at 80.  Second, each of the arbitration clauses fulfills Delaware's extra requirement, because each one begins by requiring the arbitration of any dispute arising out of or relating to the Fund Agreements and its affiliates.  (Docket no. 15-1, § 4(f); docket no. 15-2, § 13.8; docket no. 15-3, § 11; docket no. 15-4, § 30; docket no. 38-1, § 9).  As a result, under both Delaware and federal law, Duncan has clearly and unmistakably agreed to arbitrate arbitrability with respect to Hotel Fund I, Hotel Fund II, and the Winery Fund, and Banks can enforce that agreement.

b.   "Wholly Groundless"

Even though there is clear and unmistakable evidence that the parties have agreed to arbitrate arbitrability for those particular investments, an arbitrator should decide the issue only if the assertion of arbitrability is not wholly groundless.  *Douglas*, 757 F.3d at 463–64; *McLaughlin*

*v. McCann*, 942 A.2d 616, 626 (Del. Ch. 2008).   Under federal law, assertion of arbitrability is not wholly groundless if, on the one hand, there is a plausible and legitimate argument that the arbitration agreement covers the present dispute, and, on the other hand, a plausible and legitimate argument that it does not. *Douglas*, 757 F.3d at 463.   Although such inquiry necessarily requires the court to examine the arbitration agreement, this inquiry is limited, and the resolution of the plausible and legitimate arguments regarding arbitrability must be reserved for the arbitrator—the court's power is limited simply to determining whether or not a plausible argument exists. *Id.*  Similarly, Delaware courts have explained that "absent a clear showing that the party desiring arbitration has essentially no non-frivolous argument about substantive arbitrability to make before the arbitrator, the court should require the signatory to address its arguments against arbitrability to the arbitrator." *McLaughlin*, 942 A.2d at 626-27.

There is at least a plausible argument that the arbitration agreement covers any dispute arising out of Hotel Fund I, Hotel Fund II, and the Winery Fund. *See Douglas*, 757 F.3d at 463. Duncan's claim for breach of fiduciary duty is supported by factual allegations that involve Hotel Fund I, Hotel Fund II, and the Winery Fund. (*See* Docket no. 1-2, 6).   Additionally, Duncan has not made a clear showing that Banks has no non-frivolous argument about substantive arbitrability.   These facts, combined with both Delaware and federal law, create a plausible argument that the disputes relating to Hotel Fund I, Hotel Fund II, and the Winery Fund are arbitrable.

Of course, Duncan advances arguments that the arbitration agreement does not cover the these disputes.  But we need not examine those today.  Because this Court determines that there is at least a plausible argument that the disputes relating to Hotel Fund I, Hotel Fund II, and the Winery Fund could be covered by the arbitration agreements, the assertion of arbitrability is not

"wholly groundless."  As such, the Court has no choice but to order that the arbitrator decide any issues of arbitrability relating to those specific agreements.  The Court makes no finding on the issue and does not attempt to resolve the inquiry about the scope of the arbitration agreements—that determination is left to the arbitrator.  The Court holds that there are valid agreements to arbitrate that Banks may enforce, and because the parties agreed to arbitrate arbitrability, the arbitrator must decide whether those arbitration clauses encompass all, some, or none of Duncan's claims related to Hotel Fund I, Hotel Fund II, and the Winery Fund.

B. Does a federal statute or policy render the claims nonarbitrable?

Having determined that Duncan and the Funds did agree to arbitrate arbitrability, the Court proceeds to the next step in the analysis.  While the Court finds that the scope of the arbitration agreements and whether or not Duncan's claims about Hotel Fund I, Hotel Fund II, and the Winery Fund are subject to arbitration under the clauses is a question for the arbitrator, the Court, for the sake of completeness, must still determine whether there is any federal statute or policy that renders an otherwise arbitrable dispute nonarbitrable.  *See Sherer*, 548 F.3d at 381.  There is none.  Neither party advances any statute or policy that could render this dispute nonarbitrable.  Instead, the federal and Delaware policies favoring arbitration prevail.

**IV.    Claims related to the other investment funds**

Banks argues that because there are arbitration agreements present in the Hotel Fund I, Hotel Fund II, and Winery Fund documents, *all* of Duncan's claims must be sent to arbitration. (Docket no. 14, 6).  The Court disagrees.  Fifth Circuit case law "does not require all claims to be sent to gateway arbitration merely because there is a delegation provision."  *Douglas*, 757 F.3d at 463.  The "mere existence" of an agreement to arbitrate arbitrability does not bind Duncan to arbitrate questions of arbitrability "in *all* future disputes with the other party, no matter their

origin." *Id.* at 462.  A contract with an arbitration provision that contains a delegation provision does not require a party to arbitrate a claim on a completely different matter related to a completely different contract.  *Id.*  "If it were otherwise, then every case involving an arbitration agreement with a delegation provision must, with no exceptions, be submitted for such gateway arbitration; no matter how untenable the argument that there is some connection between the dispute and the agreement, an arbitrator must decide first."  *Id.* at 463.

Similarly, the Court finds that all claims not related to Hotel Fund I, Hotel Fund II, and the Winery Fund should not be ordered to arbitration.  Claims related to the other investments and the Gameday Note arise under separate contracts and are related to separate and distinct allegations.  The Court finds no evidence that Duncan and Banks agreed to arbitrate arbitrability with respect to the investment funds that are not Hotel Fund I, Hotel Fund II, and the Winery Fund.  The Court orders Duncan to file an amended complaint specifying with particularity which of the other investments—CSI Capital Management Properties, Athlon Venture fund, Dawson Real Estate Fund, Le Metier, etc.—Duncan has remaining claims under, once the claims regarding Hotel Fund I, Hotel Fund II, and the Winery Fund have been sent to arbitration and claims relating to the Gameday Note have been transferred to Colorado.

## V.     The Gameday Note and the Alternative Motion to Transfer Venue

Since the Court declines to order *all* of the claims to arbitration, the Court now considers Banks's Alternative Motion to Transfer Venue.  (Docket no. 14).   Under the plain language of 28 U.S.C. § 1404(a), a venue transfer may be made to either any district where the action might have been brought, or to any other district to which all parties have consented.  28 U.S.C. § 1404(a) (2012).  In other words, a forum-selection clause may be enforced through a motion to transfer under § 1404(a), which "permits transfer to any district where venue is also proper (*i.e.*,

'where [the case] might have been brought') or to any other district to which the parties have agreed by contract or stipulation." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 579 (2013).  "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause" and a proper application of § 1404(a) mandates that a forum-selection clause be "given controlling weight in all but the most exceptional cases" unrelated to the convenience of the parties.  *Id.* at 581.

Enforceability of a forum-selection provision is determined under federal law.  *Ginter v. Belcher, Prendergast & Laporte,* 536 F.3d 439, 441 (5th Cir. 2008).   To be valid and enforceable, a forum-selection clause must mandate that claims be brought in a particular forum. *See Fin. Cas. & Sur, Inc. v. Parker*, 2014 WL 2515136, at *2 (S.D. Tex. June 4, 2014).  If a valid forum-selection clause exists, the plaintiff's choice of forum merits no weight, and the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted.  *Atl. Marine*, 134 S. Ct. at 581.  Additionally, courts should not consider arguments about the parties' private interests—the court must deem the private-interest factors to weigh entirely in favor of the preselected forum.  *Id.*  A court can consider arguments about public-interest factors only.  *Id.* at 582.  "Because these factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases."  *Id.* Finally, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations."  *Id.*

In deciding whether the parties have consented to venue in Colorado, the Court first begins with the language of the agreement containing the forum-selection clause.   It is undisputed that the Gameday Note Warrant and Purchase Agreement contains a forum-selection clause that mandates any action related to the Gameday Note be brought in the United States District Court for the District of Colorado, Denver Division. (*See* docket no. 19, 20).  The clause applies to all claims arising "in connection with" the Gameday Note and requires—not permits— that litigation proceed in Colorado federal court.  As a result, the forum-selection clause is valid and enforceable.

Duncan argues that the forum-selection clause does not encompass his claims against Banks because Banks is not a signatory to the Gameday Note agreement.  (Docket no.  19, 22).  However, this Court's decision in *Alternative Delivery Solutions, Inc. v. R.R. Donnelley & Sons Co.* controls.  *See Alternative Delivery Solutions, Inc. v. R.R. Donnelley & Sons Co.*, 2005 WL 1862631, at \*15–16 (W.D. Tex. July 8, 2005).  In *ADS*, this Court held that a non-signatory to an agreement containing a forum-selection clause could enforce the forum-selection clause if it satisfied either the *Grigson* test or the "closely-related" test.

The *Grigson* test was used by the Fifth Circuit to address if a non-signatory to a contract could enforce an arbitration clause.  See *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524 (5th Cir.2000).  In *Grigson*, the Fifth Circuit stated that, under the doctrine of equitable estoppel, a nonsignatory may compel arbitration in two situations: (1) when a signatory to a written agreement must rely on the terms of the written agreement in asserting its claims against the nonsignatory; or (2) when a signatory to the contract raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.  *Id.* at 527; *see also Westmoreland v. Sadoux*, 299 F.3d 462, 467, 465

(5th Cir. 2002) ("We have sustained orders compelling persons who have agreed to arbitrate disputes when the party invoking the clause is a nonsignatory, but only when the party ordered to arbitrate has agreed to arbitrate disputes arising out of a contract and is suing in reliance upon that contract.").  Additionally, as this Court explained in *ADS*, arbitration clauses are a subset of forum selection clauses and "there is very little difference between the two."  *Haynsworth*, 121 F.3d at 963.

Duncan "must rely on the terms of the written agreement" in making his claims. *Grigson*, 210 F.3d at 527.  Duncan alleges that Banks was Chairman of Gameday and used that position to secure payments for himself. (Docket no. 1-1.2.B, 13).  Furthermore, he claims that a fee was withheld from Gameday's payments to him and instead paid to Banks.  *Id.*  To make this claim, he must rely on the terms of the Gameday agreement that indicate he was entitled to repayment at all.  As a result, he satisfies the first *Grigson* option.

Under the "closely related" test, a non-signatory may enforce a forum-selection clause if: (1) the non-signatory is closely related to a signatory; or (2) the alleged conduct is closely related to the contractual relationship.  *See ADS*, 2005 WL 1862631, at *16.  Here, Banks is "closely related" to a signatory.  The Gameday Note and Warrant Purchase Agreement was signed by Jeffrey Neal, who was CEO of Gameday, on behalf of Gameday.  (Docket no. 15-5, 8).  Banks was Chairman of Gameday.  *Id.*  Furthermore, the conduct Duncan complains of is "closely related to the contractual relationship."  *See ADS*, 2005 WL 1862631, at *16.  He alleges that money was withheld from his repayments under the terms of the agreement, which undoubtedly bears a close relationship to the loan agreement.  As a result he satisfies either option under the "closely related" test.

Given that there is a valid forum-selection clause which Banks may enforce, Duncan's choice of forum merits no weight.  *Atl. Marine*, 134 S. Ct. at 581.  Instead, the burden is on Duncan to establish that transfer to Colorado is unwarranted.  *Id.*  The Court finds that Duncan has established no extraordinary circumstances that warrant denial of the transfer.  Duncan argues that the forum-selection clause should not apply because "the 'incorporation of the forum selection clause was the product of . . . overreaching.'"  (Docket no. 19, 28).  Relying on this Court's opinion in *ADS*, Duncan contends that the Gameday Note was "not an arm's length transaction between two experienced and sophisticated businessman." *Id.*  The Court disagrees. In addition to being a professional basketball player, Duncan is a businessman with millions of dollars in investments and has a multitude of attorneys, advisors, and resources at his disposal. There are no extraordinary circumstances that warrant denial of the transfer.  As such, this Court finds that the forum-selection clause controls, and all claims related to the Gameday Note must be transferred to the United States District Court for the District of Colorado, Denver Division.

## CONCLUSION

For all of these reasons, Defendant's Motion to Compel Arbitration is GRANTED IN PART as to all claims related to Hotel Fund I, Hotel Fund II, and the Winery Fund and DENIED as to all other claims.  Additionally, Defendant's Alternative Motion to Transfer Venue is GRANTED.  Duncan is hereby ORDERED to submit amended pleadings that state with specificity what remaining claims he has left pending in this Court once all claims related to Hotel Fund I, Hotel Fund II, the Winery Fund, and the Gameday Note are sent elsewhere.

The Court hereby ORDERS the Clerk's office to transfer the portion of the case relating to the Gameday Note to the United States District Court for the District of Colorado, Denver

Division.   The remainder of the case—with the exception of the claims being sent to arbitration—remains pending in this Court.

It is so ORDERED.

SIGNED this 16th day of September, 2015.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE