THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| TIM DUNCAN, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § C.A. No. 5:15-CV-00148-XR |
| | § |
| CHARLES BANKS, | § |
| | § |
| Defendant. | § |
| | § |

## INITIAL COMPLAINT AFTER REMOVAL

Plaintiff Tim Duncan ("Duncan") files this Initial Complaint after Removal against Charles Banks ("Banks" or "Defendant").

### I. PROCEDURAL BACKGROUND

1. On June 10, 2015, this Court heard Defendant's Motion to Compel Arbitration and in the Alternative Transfer Venue (Dkt. No. 14) (the "Motion"). On September 17, 2015, the Court entered an order granting in part and denying in part the relief sought in the Motion. (Dkt. No. 49). The Court transferred that portion of the case relating to Gameday Entertainment LLC to the United States District Court for the District of Colorado. The claims related to Terroir Hotel and Resort Fund, Terroir Hotel and Resort Fund II and Terroir Winery Fund were sent to arbitration. The Court then ordered Duncan to re-plead in this action any remaining claims. Duncan files this Complaint pursuant to the Court's September 17, 2015 Order.

### II. PARTIES

2. Duncan is an individual residing in San Antonio, Texas.

3. Banks is an individual residing in Atlanta, Georgia.

#5011993.2

## III. JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction over this action by reason of the parties' diversity of citizenship pursuant to 28 U.S.C. §1332(a)(1). The amount in controversy exceeds $75,000, excluding interest and costs. This court has personal jurisdiction over the Defendant because the fiduciary relationship in question arose in Texas and because he conducted business, including but not limited to the transaction or transactions that are the subject matter of this lawsuit in this judicial district, as alleged in this Complaint, or otherwise has sufficient contacts with the state.

5.     Venue is proper in this judicial district under the provisions of 28 U.S.C. §1391(b)(2). All or a substantial part of the events or omissions giving rise to the claims made the basis of this lawsuit occurred in Bexar County, Texas.

## IV. FACTUAL BACKGROUND

6.     Duncan is a professional basketball player. He has played his entire professional career with the San Antonio Spurs of the National Basketball Association ("NBA").

7.     Banks is Duncan's former financial/investment advisor. Duncan met Banks, who was then the president of CSI Capital Management ("CSI") during Duncan's rookie year – in approximately 1997 – when Duncan was 21 years old. Banks and others pitched CSI to Duncan in 1997. They presented their investment philosophy as conservative to allow for slow and steady growth. Duncan agreed to engage CSI.

8.     Duncan entered into two agreements with CSI in 1997. In the first - entitled "Agreement – Investment Counseling" – CSI agreed to "provide investment counseling services." Upon information and belief, this contract was in effect until CSI was purchased by SunTrust Bank ("SunTrust") in 2011. Banks signed the first agreement on behalf of CSI.

9. The second agreement was entitled "Agreement – Financial Services" and stated, in part:

> Client hereby retains CSI to provide tax planning, financial advisory and investment counseling services. CSI agrees to perform such services for Client.

10. The second contract remained in effect until April 1, 2000, when a new contract "Business Management and Financial Services Agreement" was signed. The new contract obligated CSI to provide "business management and development services."

11. Banks was to act as Duncan's financial/investment advisor and was to be Duncan's main point of contact as Banks claimed he was primarily responsible for recruiting Duncan. Banks was a registered investment advisor at the time Duncan met him and continued his registration with the Securities and Exchange Commission ("SEC") until in or around 2011.

12. Duncan was (and still is) professionally committed to play pre-season games, approximately 82 regular season games, and post-season games – a commitment that requires substantial travel time. Duncan's life as a professional athlete presented challenges to personally managing his financial and investment affairs due, in part, to the logistics of coordinating paperwork, signatures, telephone calls and conferences.

13. Duncan required an advisory team with a leader he could trust and rely on and, as the relationship evolved, Duncan came to believe he had just such a team leader in Banks. Duncan only dealt with Banks and his assistants at CSI. He did not have a relationship with any other advisors at CSI. Duncan essentially gave control of his financial/investment affairs to Banks. Duncan had little interaction with his own finances as much of the day-to-day management was left to Banks and CSI.

14. Duncan reviewed his personal financial goals with Banks and expected Banks to act in his best interest related to those goals. Banks, as an investment adviser representative and agent of CSI, owed a fiduciary obligation to Duncan. During Banks' time at CSI, CSI invested Duncan according to CSI's conservative philosophy. CSI did invest Duncan in several private equity deals but each was for a very small percentage of Duncan's wealth.

15. Banks left his position as President of CSI in 2007. By this time, Duncan was 10 years into a successful NBA career and 10 years into a trust relationship with Banks. Upon information and belief Banks remained a shareholder of CSI until it was sold to SunTrust in 2011. Additionally, he was registered as an Investment Adviser Representative until September 27, 2011 according to an Investment Adviser Representative Public Disclosure Report.

16. Banks' trust relationship with Duncan and his finances continued. Banks continued to solicit and advise Duncan to invest in private equity deals. By the summer of 2012, Banks had been Duncan's financial advisor for over 14 years and had directed and/or oversaw Duncan's investments in various deals, funds and ventures.

17. In August of 2012 Banks started promoting yet another investment to Duncan. This time the industry in question was cosmetics – an industry in which Banks had virtually no experience. The cosmetic company was called Metier Tribeca LLC d/b/a Le Metier de Beaute ("Le Metier"). Banks pitched Le Metier to Duncan saying:

> ...that it was "doing approx. $8m in sales in 2012 and its profitable. I love the CEO and founder and our co-investor started and sold Bobbi Brown cosmetics. We are investing approx. 2.5m. Im investing $1m, KG is going 500K and the bobbi brown guy is doing 500K. Interested in the other 500?"

18. Upon information and belief, the CEO and founder referred to was Richard Blanch. The purported "co-investor" was Ken Landis who, on information and belief, was a co-

#5011993.2

founder of a cosmetic company called Bobbi Brown Cosmetics, Inc. "KG" is believed to be Kevin Garnett - an NBA basketball player. Banks solicited Duncan to invest $500,000.00 in Le Metier. The email that contained the pitch included an attachment dated June 2012 that ostensibly was a "due diligence" document.

19. Unbeknownst to Duncan - sometime during that same month - it became apparent, upon Banks review of the Le Metier books and records provided for pre-investment due diligence, that Blanch's sales projection totals were unlikely to be achieved. Banks and others involved advised Le Metier and Richard Blanch that they would not proceed with their investment.

20. Regardless, on September 14, 2012, a Certificate of Formation for Le Metier Beauty Investment Partners LLC ("LMBIP") was filed with the Delaware Secretary of State to create the investment vehicle for the Le Metier investment.

21. Sometime on or before October 22, 2012 Banks concluded that Blanch was desperate to close Banks' investment in Le Metier.

22. Banks did not provide or tell Duncan about any updated "due diligence" documents before Duncan made his investment. Duncan was not told that Banks had advised Le Metier that he was skeptical about sales projections and that he was not proceeding with his investment. Banks did not tell Duncan that the questionable sales projections increased the risk of the pitched investment and that the CEO and founder was "desperate" to close the investment.

23. Upon information and belief, Banks had little confidence in the management of Le Metier and had concocted a strategy to replace that management.

24. Regardless, Banks texted Duncan on October 24, 2012 soliciting Duncan's money. But rather than asking for $500,000.00 as originally pitched, he asked for a wire of

$1.1 million providing no other explanation than "…more than we thought only due to the fact that we are picking up extra 10% of company. So very good news."

25. Relying on his trust/fiduciary relationship with Banks and without the benefit of the information Banks had acquired, Duncan authorized a wire from Comerica Bank to fund the recommended $1.1 million investment.[1]

26. Duncan was not advised that the "co-investor [who] started and sold Bobbi Brown cosmetics," upon information and belief, was not making any investment at all. Nor was he told why Duncan should invest $600,000.00 more than Banks had originally pitched. Nor did Banks share with Duncan any of his skepticism regarding the company's management and their sales projections.

27. On October 25, 2012, $1.1 million was wired from Duncan's Comerica account to Jay Landrum, attorney for LMBIP. Upon information and belief LMBIP had raised $3.3 million. On October 31, 2012 LMBIP made an investment in Le Metier of $1,800,000.00 for a 10% interest. Banks also received a seat on the board as a result of the investment. Upon information and belief, LMBIP entered into an agreement on October 31, 2012 with Island Def Jam Music to purchase a 12% interest in Le Metier that they owned. The price was $1.25 million. Duncan is not aware at this time of what happened to the remaining $250,000 that was supposed to be invested in Le Metier.

28. Despite funding the investment, Duncan had not been asked to sign any investment documents. On November 19, 2012 Banks – offering no explanation, comments, summaries, analysis or risk assessment – texted Duncan saying he was "fedexing Le Metier

---

[1] The $1.1 million was part of a $10 million dollar transfer from Comerica, $7.5 million of which was for an investment made in Gameday Entertainment LLC that consisted of a Note and Warrant Purchase Agreement. The Gameday investment is the subject of a claim this Court transferred to the District of Colorado.

operating agreement – can you sign and return ASAP."[2] The operating agreement noted Duncan's $1.1 million investment but contained no other obligation to provide additional investment funds via capital calls or any other mechanism.

29. Upon information and belief, in January 2013 Banks discovered accounting irregularities on the part of Le Metier including apparent fraudulent activity. Banks and another investor hired a firm called Profit Solutions Group to audit the company. Banks did not share this information with Duncan. Rather, in a February 19, 2013 text to Duncan, Banks stated: "need to update on … Le Metier deal. All good news."

30. On March 27, 2013 Banks texted Duncan: "on another note you have two capital calls (one for winery fund as we are buying 3 new wineries bringing total to 9! And one for Le Metier). Shall we send from Comerica? Probably easiest?"

31. On July 3, 2013, Banks, on behalf of LMBIP, filed a lawsuit against Le Metier and Richard Blanch in the U.S. District Court for the Southern District of New York.

32. On February 14, 2014, Le Metier filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York.

V. BREACH OF FIDUCIARY DUTY

33. To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

34. Duncan and Banks had a formal fiduciary relationship pursuant to Banks' role as Duncan's securities broker and investment/financial advisor.

---

[2] Per the operating agreement, the manager of LMBIP was Catalyst Creative Ventures LLC ("CCV"). It was not disclosed to Duncan that Banks was a co-owner of CCV with Eric Kuskey. CCV was to receive a 30% share of the net profit and a 30% share in any profit in excess of the members' contribution. CCV was also to receive a $100,000 initial payment for closing the investment with Le Metier and base compensation of $25,000 per year, first due on January 1, 2013. None of these facts were disclosed to Duncan prior to the funding of his investment.

-7-

#5011993.2

35. Additionally, or alternatively, Duncan and Banks had an informal fiduciary relationship of trust and confidence by virtue of Banks' longstanding status as Duncan's personal and financial advisor and confidante. Banks knew or should have known that Duncan was relying on him in matters related to his financial investments.

36. Whether formal or informal, Banks owed Duncan a fiduciary duty. That fiduciary duty extended to all investments that Banks solicited Duncan to make or advised him about. Specifically for purposes of this lawsuit, Banks' fiduciary duty extended to all matters involving Le Metier.

37. As a fiduciary, Banks owed Duncan multiple duties, including:

 (a) The duty of loyalty and utmost good faith;

 (b) The duty of candor;

 (c) The duty to refrain from self-dealing;

 (d) The duty to act with the highest integrity;

 (e) The duty of fair and honest dealing; and

 (f) The duty of full disclosure.

38. Banks breached these duties by failing to fully, fairly, and honestly disclose material information to Duncan before he made his investment, namely:

 (a) that updated "due diligence" documents existed that were different from those that Banks had sent to Duncan;

 (b) that Banks was skeptical about Le Metier's sales projections and that he had told Blanch that he was not proceeding with his investment;

 (c) that the questionable sales projections increased the risk of the pitched investment;

 (d) that the CEO and founder – Blanch - was "desperate" to close the investment.

 (e) that Banks had little confidence in the management of Le Metier and Metier Tribeca and had concocted a strategy to replace that management;

(f) the reasons for seeking an additional $600,000.00 from Duncan, bringing Duncan's total investment to $1.1 million, when Banks' initial pitch was for $500,000.00;

(g) that the founder of Bobbi Brown cosmetics was not investing $500,000.00 as Banks had earlier represented;

(h) the reasons why Banks concluded to buy an increased interest in the company above that initially pitched – describing it as "very good news" - in light of his skepticism about sales projections, management, Blanch's desperation and no investment by the Bobbi Brown founder; and,

(i) that he was taking steps within the company that would affect Duncan's investment.

39. Duncan has suffered damages as a direct and proximate result of Banks' breach of his fiduciary duty and Duncan will continue to suffer damages in the future. Duncan is entitled to recover the damages resulting from this breach. Duncan is also entitled to the imposition of a constructive trust on the proceeds, funds, or property obtained as a result of Banks' breach of his fiduciary duty to Duncan.

40. Banks intended to gain benefits to which he was not entitled making his breach of his fiduciary duty to Duncan intentional and entitling Duncan to exemplary damages.

## VI. COMMON LAW FRAUD

41. To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

42. As detailed above, in order to induce Duncan's investment in Le Metier, Banks engaged in a pattern of misrepresentations, misstatements and omissions, in order to enrich himself at the expense of Duncan. Specifically, Banks defrauded Duncan through a pattern of deliberate misrepresentations, omissions, and other misconduct, including those listed at Paragraph 38 (a)-(i) above.

#5011993.2

43. Banks knew, or recklessly disregarded, that the material misrepresentations, misstatements and omissions to Duncan were false when made. Moreover, each such misrepresentation or omission was material as to the quality of the investment that Banks was recommending, and relevant to Duncan's decision to invest. Banks made these material misrepresentations and omissions, or caused them to be made, with the intent that Duncan would rely on them in making his decision to invest in Le Metier.

44. By reasonably relying upon Defendant's misrepresentations and omissions, Duncan has suffered damaged proximately caused by Defendant's fraud.

45. Banks is also liable for, and Duncan is entitled to, punitive damages attributable to Defendant's reckless, willful, and wanton conduct.

## VII. FRAUDULENT INDUCEMENT

46. To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

47. As detailed above, in order to deceive Duncan, Banks knowingly misrepresented the financial stability of Le Metier, the quality and risk of the investment, the individuals participating in the investment, and those facts at Paragraph 38 (a)-(i) above.

48. Duncan, reasonably relying on these misrepresentations, was induced to enter into the investment in Le Metier. Duncan suffered damages proximately caused by Defendant's fraudulent inducement.

49. Duncan is entitled to rescission of the investment contract, a return from Banks of the $1.1 million he invested, and such other relief as this Court may deem proper.

## VIII. VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

50. To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

51. As detailed more particularly above, Banks intentionally, carelessly, or recklessly misrepresented and omitted material facts in connection with the sale of securities to Duncan. The Defendant's misrepresentations and omissions were intended to and did deceive Duncan, for the purpose of causing Duncan to invest in Le Metier. These false and misleading statements and omissions of material fact, detailed more fully above, include those listed at Paragraph 38 (a)-(i) above.

52. Duncan reasonably relied on the Defendant's representations, in light of the Defendant's purported reputation in the investment community, past communications regarding investment goals and advice, and based on the representations Banks made about the Le Metier investment. At the time of the investment, Duncan was unaware of the falsity of the material misrepresentations and omissions.

53. As a direct, proximate and foreseeable consequence of Defendant's misrepresentations, nondisclosures and omissions, Duncan invested in Le Metier, which has caused Duncan damages.

## IX. VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940

54. To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

55. As detailed more particularly above, Banks knowingly defrauded Duncan in violation of Section 206 of the Investment Advisers Act of 1940.

#5011993.2

-12-

56. The misstatement, misrepresentations and omissions of material fact were a scheme and artifice to defraud Duncan; Banks engaged in a transaction, practice or course of business which operated as a deceit or fraud upon Duncan; and/or by such conduct, engaged in acts, practices or course of business which was fraudulent, deceptive, or manipulative, all in violation of section 206 of the Act.

57. Banks failed to fully inform Duncan of all material facts, including, those facts listed at Paragraph 38 (a)-(i) above.

58. As a direct, proximate and foreseeable consequence of Defendant's misrepresentations, nondisclosures, and omissions, Duncan invested in Le Metier, which has caused Duncan damages.

## X. DAMAGES

59. To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

60. As a direct and proximate result of Defendant's breach, Duncan has and will continue to suffer damages and is entitled to recover his actual damages, attorneys' fees, pre- and post-judgement interest and costs.

61. Duncan seeks rescission of the investment agreement and a return from Banks of the $1.1 million he invested.

62. Duncan also seeks punitive damages in recognition of the knowing, willful, and wanton nature of Defendant's misconduct.

#5011993.2

DATE: November 5, 2015

Respectfully submitted,

BRACEWELL & GIULIANI LLP
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone: (210) 226-1166
Facsimile: (800) 404-3970

_____
Richard C. Danysh
State Bar No. 05377700
Richard.Danysh@bgllp.com
J. Tullos Wells
State Bar No. 21146500
Tullos.Wells@bgllp.com
Michael D. Bernard
State Bar No. 02211310
Michael.Bernard@bgllp.com
Jacqueline Garza-Rothrock
State Bar No. 24063784
Jacqueline.Garza-Rothrock@bgllp.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2015, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to of such filing to all counsel of record.

_____
Richard C. Danysh

#5011993.2